**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Ennstone, Inc., *et al.* [1] | : | Case No. 09-31204 (DOT) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------x

**AMENDED DISCLOSURE STATEMENT TO ACCOMPANY THE DEBTORS' AMENDED
PLAN OF REORGANIZATION DATED NOVEMBER 24, 2009**

David I. Swan, Esq. (VSB No. 75632)
Sarah B. Boehm, Esq. (VSB No. 45201)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000

Mark E. Freedlander, Esq.
Nicholas E. Meriwether, Esq.
McGuireWoods LLP
625 Liberty Avenue, 23rd Floor
Pittsburgh, Pennsylvania 15222
(412) 667-6000

*Attorneys for the Debtors-in-Possession*

---

[1]  The Debtors are Ennstone, Inc. and King William Sand & Gravel Mattaponi, Inc.  The last four digits of Ennstone and King William Mattaponi's tax identification numbers are 9953 and 2639, respectively.

## IMPORTANT NOTICE

This Disclosure Statement[2] and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtors, their business operations or the value of their assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions and orders filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Debtors reserve the right to file an amended Plan and Disclosure Statement from time to time.

The Debtors urge you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classifications of claims, the history of the Debtors and the Cases, the Debtors' businesses and properties and a summary and analysis of the Plan.

The Plan and Disclosure Statement are not required to be prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law. The Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information;" however, such approval does not constitute an endorsement of the Plan or Disclosure Statement by the Bankruptcy Court.

The Disclosure Statement contains only a summary of the Plan. This Disclosure Statement is not intended to replace a careful and detailed review of the Plan, but instead, is an aid and supplement to such review. This Disclosure Statement is qualified in its entirety by reference to the Plan and the agreements and documents described therein. If there is a conflict between this Disclosure Statement and the Plan, the provisions of the Plan will govern. You are encouraged to review the full text of the Plan and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of November 24, 2009 and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained herein is correct at any time after November 24, 2009. Any estimates of claims in this Disclosure Statement may vary from the final amounts of claims allowed by the Bankruptcy Court.

You should not construe this Disclosure Statement as providing any legal, business, financial or tax advice. You should, therefore, consult with you own legal, business, financial and tax advisors as to any such matters in connection with the Plan, the solicitation of votes on the Plan and the transactions contemplated by the Plan.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission or stipulation.

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Debtors' Plan of Reorganization dated November 24, 2009 (the "Plan")

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................................................1

    A.      Purpose of the Disclosure Statement ................................................................................1

    B.      Voting ...............................................................................................................................2

    C.      Confirmation Hearing .......................................................................................................5

II.     GENERAL INFORMATION ......................................................................................................6

    A.      Overview of Chapter 11 ....................................................................................................6

    B.      Description of the Debtors ................................................................................................7

    C.      Summary of Prepetition Financing ...................................................................................7

    D.      Events Leading to Chapter 11 Filing ................................................................................9

III.    THE CHAPTER 11 CASE ...........................................................................................................9

    A.      Commencement of the Chapter 11 Case and First Day Relief .........................................9

    B.      Case Administration .......................................................................................................10

    C.      Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and
        United States Trustee Guidelines ....................................................................................14

IV.     SUMMARY AND OVERVIEW OF THE PLAN......................................................................14

    A.      Classification and Treatment of Allowed Claims and Equity Interests ...........................18

    B.      Sale of Non-Core Assets.................................................................................................24

    C.      The New Term Loan and Non-Core Asset Sale Note......................................................25

    D.      The Litigation Trust .......................................................................................................26

    E.      Substantive Consolidation ..............................................................................................26

    F.      Corporate Governance of Reorganized Ennstone ...........................................................27

    G.      The Management Incentive Plan .....................................................................................27

    H.      Claims Adjudication and Distributions...........................................................................28

    I.      Executory Contracts........................................................................................................29

    J.      Release and Exculpation .................................................................................................30

    K.      Effect of Confirmation ...................................................................................................30

    L.      Retention of Jurisdiction of the Bankruptcy Court .........................................................32

    M.      Conditions Precedent ......................................................................................................33

    N.      Modification of the Plan .................................................................................................33

    O.      Revocation and Withdrawal of Plan ...............................................................................33

    P.      Section 1145 Exemption .................................................................................................33

V.      UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS.......................................33

    A.      Introduction.....................................................................................................................33

i

# TABLE OF CONTENTS

(continued)

Page

B.    Certain Material United States Federal Income Tax Consequences to the Debtors ........34

C.    Certain Material United States Federal Income Tax Consequences to Holders of Claims ...................................................................................................................36

VI.    ALTERNATIVES TO THE PLAN ...........................................................37

A.    Other Plans of Reorganization .........................................................38

B.    Liquidation under Chapter 7 of the Bankruptcy Code ....................................38

C.    Dismissal of the Chapter 11 Cases.....................................................38

VII.    CONFIRMATION REQUIREMENTS .......................................................38

A.    Acceptances Necessary to Confirm the Plan .................................................38

B.    Best Interests of Creditors.....................................................................39

C.    Feasibility..............................................................................................40

D.    Confirmation of the Plan.......................................................................40

VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED ....................................40

A.    Parties-In-Interest May Object to the Debtors' Classification of Claims ......................40

B.    The Debtors' May Not Be Able to Secure Confirmation of the Plan .............................40

C.    The Debtors May Object to the Amount or Classification of Your Claim ......................41

D.    Business Operations and Financial Projections .................................................41

IX.    WHERE YOU CAN OBTAIN MORE INFORMATION.............................................41

X.    CONCLUSION AND RECOMMENDATION...........................................................41

## EXHIBITS

Exhibit A    -    Debtors' Plan of Reorganization dated November 24, 2009

Exhibit B    -    Order Approving Disclosure Statement

Exhibit C    -    Liquidation Analysis

Exhibit D    -    Financial Projections

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Ennstone, Inc., *et al*.[1] | : | Case No. 09-31204 (DOT) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------x

## I.    INTRODUCTION

**A.    Purpose of the Disclosure Statement**

On February 24, 2009, Ennstone, Inc. ("Ennstone") and King William Sand & Gravel Mattaponi, Inc., a wholly owned subsidiary of Ennstone ("King William Mattaponi," together with Ennstone, the "Debtors") filed for bankruptcy protection under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"). The Debtors' bankruptcy filings were precipitated by insufficient liquidity to operate in the ordinary course of business, the expiration of a forbearance agreement with their working capital lenders and the receipt of several notices of default from equipment lessors and/or finance parties. On October 22, 2009, the Debtors filed a Chapter 11 Plan of Reorganization, as amended on November 24, 2009 (the "Plan"), which revises their capital structure, and positions the Debtors to operate more efficiently and profitably as the local construction materials market rebounds, thus maximizing the value of the Debtors' estate for all stakeholders.

The Debtors prepared this Disclosure Statement to accompany and in connection with their solicitation of acceptance of the Plan. After notice and a hearing, and upon an order of the Bankruptcy Court dated November ___, 2009, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail that would enable a hypothetical reasonable investor, typical of holders of claims in interests of the classes being solicited, to make an informed judgment whether to vote to accept or reject the Plan.

A copy of the Plan and exhibits thereto is attached to this Disclosure Statement as Exhibit A, and is incorporated herein by reference. A copy of the order of the Bankruptcy Court approving this Disclosure Statement is attached hereto as Exhibit B. A copy of the Liquidation Analysis is attached hereto as Exhibit C. A copy of the Debtors' Financial Projections through calendar year 2012 is attached hereto as Exhibit D. Unless otherwise specifically noted, all capitalized terms utilized herein shall have the meaning ascribed to such terms in the Plan.

You should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No statements or information concerning the Debtors or any other entity described in this Disclosure Statement or in the Plan, particularly, but not limited to, the Debtors' financial results, assets or liabilities, are authorized by the Debtors, other than as set forth in this Disclosure Statement or the Exhibits hereto.

---

[1] The Debtors are Ennstone, Inc. and King William Sand & Gravel Mattaponi, Inc. The last four digits of Ennstone and King William Mattaponi's tax identification numbers are 9953 and 2639, respectively.

The financial information set forth in this Disclosure Statement has not been audited by independent certified public accountants, nor has it necessarily been prepared in accordance with generally accepted accounting principles, except as specifically set forth herein.  For that reason, and as a result of the complexity of their financial affairs, the Debtors do not represent or warrant that the information set forth in this Disclosure Statement is without any inaccuracies.  To the extent possible, however, the information has been prepared from the Debtors' financial books and records and every reasonable effort has been made by the Debtors to ensure that all information in this Disclosure Statement has been fairly presented.

**B.**      **Voting**

Any holder of a Claim or Equity Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan is considered "Impaired."  Each holder of a Claim or Equity Interest of a Class that is "Impaired" under the Plan, but is not deemed to have rejected the Plan, will receive this Disclosure Statement, the Plan, the Voting Procedures Order, notice of the Confirmation Hearing, and a Ballot for assuming or rejecting the Plan.

Each holder of a Claim or Equity Interest of a Class that is either deemed to reject or deemed to accept the Plan will receive this Disclosure Statement, the Plan, the Voting Procedures Order, notice of the Confirmation Hearing and a notice of non-voting status in the form approved by the Bankruptcy Court, but will not receive a Ballot and will not be entitled to vote on the Plan.

---

**Which Classes of Claims are Entitled to Vote on the Plan?**

Classes of Claims and Equity Interests are entitled to vote on the Plan as follows:

- Claims in Classes 1 and 2 are Unimpaired, are deemed to have accepted the Plan and are not entitled to vote on the Plan

- Claims in Classes 3, 4, 5, 6 and 7 are Impaired and entitled to vote on the Plan

- Equity Interests in Class 8 will receive no distribution under the Plan, are deemed to have rejected the Plan and are not entitled to vote on the Plan

---

For a description of the Classes of Claims and Equity Interests and their respective treatment under the Plan, see Section IV.A below, entitled "Classification and Treatment of Allowed Claims and Equity Interests."

You may only vote on the Plan with respect to a Claim or Equity Interest if that Claim or Equity Interest belongs to a Voting Class under the Plan.  Class 4 includes a number of sub-classes, each of which is considered a separate Voting Class.  By law, under the Plan all holders of Equity Interests are deemed to have rejected the Plan and will not be entitled to vote.  The Bankruptcy Court has fixed November 24, 2009 as the Voting Record Date.  To be eligible to vote on the Plan, persons with Claims that belong to a Voting Class must have held them on the Voting Record Date.

Under the Bankruptcy Code, the Plan will be deemed accepted by an Impaired Class of Claims if the Debtors receive Ballots accepting the Plan representing at least:

- two-thirds of the total dollar amount of the allowed Claims in the Class that cast a Ballot; and

- more than one-half of the total number of allowed Claims in the Class that cast a Ballot.

All properly completed Ballots received by the Debtors no later than January 13, 2010 at 5:00 p.m. (Eastern) (the "Voting Deadline") will be counted in determining whether each Impaired Class entitled to vote on the Plan has accepted the Plan. All Ballots must be mailed, postage prepaid, to, and received by, the Debtors by the Voting Deadline. Any Ballots received after the Voting Deadline will not be counted. All Ballots must contain an original signature to be counted. No Ballots received by facsimile or electronic mail will be accepted. For more information on voting procedures, please review carefully the Voting Procedures Order.

---

**Voting on the Plan**

*When does the Ballot need to be received?* The deadline for the receipt by the Debtors of properly completed Ballots is January 13, 2010 at 5:00 p.m. (Eastern).

*Which Classes may vote?* Persons may vote to accept or reject the Plan only with respect to Allowed Claims that belong to a Class that is Impaired under the Plan and is not deemed to have rejected the Plan. **These are Class 3, Class 4, Class 5, Class 6 and Class 7.**

*How do I vote on the Plan?* For a vote to be counted, the Debtors must receive an original signed copy of the Ballot form approved by the Bankruptcy Court. Faxed copies and votes sent on other forms will not be accepted.

*Who should I contact if I have questions or need a Ballot?* You may contact the Debtors at the address or phone number listed below.

---

This Disclosure Statement and the Plan are the only materials that you should use in determining how to vote on the Plan. The Debtors believe that the approval of the Plan provides the greatest return to holders of Claims in the Voting Classes.

---

**Voting Recommendations**

The Debtors believe that the Plan presents the best opportunity for holders of Claims to maximize their respective recoveries. **The Debtors encourage holders of Claims to vote to _ACCEPT_ the Plan.**

---

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote. For this reason, in voting on the Plan, please only use only the Ballot sent to you with this Disclosure Statement. If you hold Claims in more than one Class, you must use a separate Ballot for voting with respect to each Class of Claims that you hold. If you believe you have received the incorrect form of Ballot, if you need another Ballot, or if you have any questions concerning the form of Ballot, please contact the Debtors.

Please complete and sign your Ballot and return it, with appropriate postage, in the enclosed pre-addressed envelope to the Debtors. All correspondence in connection with voting on the Plan should be directed to the Debtors at the following address:

> McGuireWoods LLP
> Attn: Sarah B. Boehm, Esquire
> One James Center
> 901 East Cary Street
> Richmond, Virginia 23219
> (804) 775-1000

The Debtors will prepare and file with the Bankruptcy Court a certification of the results of the voting on the Plan on a Class-by-Class basis.

Additional copies of the Ballots, this Disclosure Statement and the Plan are available upon request made to the Debtors. Please contact the Debtors with any question relating to voting on the Plan.

---

**Your Vote is Important**

Your vote on the Plan is important because:

- Under the Bankruptcy Code, a chapter 11 plan can only be confirmed if certain majorities in dollar amount and number of claims (as described above) of each Voting Class under the plan vote to accept the plan, unless the "cram down" provisions of the Bankruptcy Code are used.

- Under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether the specified majority of votes in favor of the plan have been received.

- If you are eligible to vote with respect to a Claim and do not deliver a properly completed Ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will *not* be considered in determining the number and dollar amount of Ballots needed to make up the specified majority of that Claim's Class for the purpose of approving the Plan.

---

All pleadings and other documents referred to in this Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the Office of the Clerk of the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division), 701 East Broad Street, Richmond, VA 23219; telephone (804) 916-2400, or online at the Bankruptcy Court's website: http://www.vaeb.uscourts.gov/home/rihome.html.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND OTHER DOCUMENTS RELATING TO THE PLAN. WHILE THE DEBTORS SUBMIT THAT THOSE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, THESE SUMMARIES ARE QUALIFIED BY THE COMPLETE TEXT OF SUCH DOCUMENTS. IF ANY INCONSISTENCIES EXIST BETWEEN THE

TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN AND OTHER DOCUMENTS ARE CONTROLLING. EACH HOLDER OF AN IMPAIRED CLAIM SHOULD REVIEW THE ENTIRE PLAN AND ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN BY HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

EXCEPT TO THE EXTENT OTHERWISE SPECIFICALLY NOTED HEREIN, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GENERALLY INTENDED TO DESCRIBE FACTS AND CIRCUMSTANCES ONLY AS OF NOVEMBER 24, 2009 AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER NOVEMBER 24, 2009 OR THAT THE DEBTORS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE DEBTORS SUBMIT THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EVERY CREDITOR AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

**C.      Confirmation Hearing**

The Bankruptcy Court will hold the Confirmation Hearing at the following time and place:

| Confirmation Hearing |
| --- |
| **Date and Time:** Commencing at 11:00 a.m. (prevailing EST), on January 21, 2010 |
| **Place:** United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division), Room 5100, 701 East Broad Street, Richmond, VA 23219 |
| **Judge:** Douglas O. Tice, Jr., United States Bankruptcy Judge, Eastern District of Virginia (Richmond Division) |
| The Confirmation Hearing may be adjourned from time to time on announcement in the Bankruptcy Court on the scheduled date for the Confirmation Hearing. No further notice will be required to adjourn the Confirmation Hearing. |

At the Confirmation Hearing, the Bankruptcy Court will:

- Determine whether sufficient majorities in number and dollar amount, as applicable, from each Voting Class have delivered properly executed votes accepting the Plan to approve the Plan;

- Hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- Determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- Determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing and filed and served as required by the Bankruptcy Code under the order approving this Disclosure Statement.  That order requires any objections to the confirmation of the Plan to be served so as to be received **on or before 4:00 p.m. (prevailing EST) on January 13, 2010,** by the following persons:

- Counsel for the Debtors, McGuireWoods LLP, 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102, Attn: David Swan, Esquire;

- Counsel for the Committee, Whiteford Taylor & Preston, LLP, 3190 Fairview Park Drive, Suite 300, Falls Church, VA 22042, Attn: Christopher A. Jones, Esquire;

- The Office of the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, VA 23219, Attn: Robert B. Van Arsdale, Esquire.

## II.   GENERAL INFORMATION

### A.   Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession".

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in

sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of claims against and equity interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.   Description of the Debtors**

Ennstone is the wholly-owned subsidiary of Ennstone plc, which is a UK public corporation headquartered in Derby, England.  On March 9, 2009, Ennstone plc was placed into administration, and Deloitte LLP was appointed as the administrator.

Ennstone mines, processes and sells sand and gravel products and produces and sells ready-mix concrete in the states of Virginia, Pennsylvania, Ohio, West Virginia, Maryland and in the District of Columbia.  Ennstone's business is comprised of four (4) regional operating divisions, two of which are focused on concrete and two of which are focused on aggregates as follows:

- Ennstone Aggregates (North):  Covering Western Pennsylvania and Eastern Ohio with six sand and gravel quarries;

- Ennstone Aggregates (South):  Covering Washington, DC to Richmond, Virginia with five sand and gravel quarries, and West Virginia with one limestone quarry;

- Colonial Concrete:  Covering the I-95 corridor from Washington Dulles to Richmond, Virginia with eight concrete plants and a pre-mix mortar operation; and

- Valley Redi-Mix:  Covering the Shenandoah region of Virginia, Maryland and West Virginia with eight concrete plants.

King William Mattaponi is a wholly-owned subsidiary of Ennstone.  King William Mattaponi is the lessee of real property for the Debtors' sand and gravel operations in Aylett, Virginia.  This Chapter 11 Plan provides for a merger of King William Mattaponi into Ennstone, Inc.

In calendar year 2007, the Debtors had gross sales of approximately $70 million.  In calendar year 2008, the Debtors had gross sales of approximately $65 million.

**C.   Summary of Prepetition Financing**

1.   The Credit Agreement

On August 31, 2007, the Debtors and Wachovia Bank, National Association ("Wachovia"), as administrative agent, entered into a certain Amended and Restated Loan Agreement (as further amended, the "Credit Agreement") which included various term and swingline notes (the "Notes") in favor of Wachovia, Fulton Bank, and StellarOne Bank (the "Lender Group") secured by substantially all of the Debtors' assets.  In conjunction with the Credit Agreement, the Debtors and Wachovia entered into a series of Reimbursement Agreements relating to certain letters of credit issued in connection with tax-exempt municipal bonds (the "Reimbursement Agreements").  Further, the Debtors and Wachovia were parties to interest rate swap agreements dated July 26, 2007 which were terminated on or about January 9, 2009 (the "Swap Agreements").

As of the Petition Date, the following amounts were due and owing by the Debtors to the Lender Group:

| | |
|---|---|
| Notes: | $55,869,284.81 |
| Reimbursement Agreements: | $ 2,910,133.33 |
| Swap Agreements: | $ 1,001,750.00 |
| **TOTAL:** | **$59,781,168.14** |

2.    The Tax-Exempt Bonds

Ennstone is obligated under four (4) series of tax-exempt industrial development revenue bonds, as follows:

a.    The Series 1999 IRB issued by the Virginia Small Business Financing Authority in the original aggregate principal amount of $5,000,000 for projects financed in King George County (Kenson Farms), Prince William County (Dumfries), Culpeper County (Germanna Highway), and Hanover County (Stone Quarry Drive).  The current amount outstanding under the Series 1999 Virginia IRB is approximately $1.4 million, of which $900,000 is due on July 1, 2010 and $500,000 is due on July 1, 2011.

b.    The Series 1999 IRB issued by the Lawrence County Industrial Development Authority in the original aggregate principal amount of $2,400,000 for a project financed in Lawrence County, Pennsylvania (Taylor Run).  The current amount outstanding under the Series 1999 Pennsylvania IRB is approximately $600,000, of which $400,000 is due on July 1, 2010 and $200,000 is due on July 1, 2011.

c.    The Series 2001 IRB issued by the Virginia Small Business Financing Authority in the original aggregate principal amount of $4,700,000 for projects financed in Prince William County (Manassas) and Albemarle County (Charlottesville).  The current amount outstanding under the Series 2001 IRB is approximately $800,000, of which $300,000 is due on July 1, 2010, $300,000 is due on July 1, 2011, and $200,000 is due on July 1, 2012.

The bond trustee for the Series 1999 and Series 2001 IRBs is First Citizens Bank & Trust Company.  In connection with these IRBs, Ennstone and Wachovia entered into the Reimbursement Agreements, pursuant to which Wachovia issued irrevocable letters of credit to secure the bond payments. Ennstone, in turn, is required to make quarterly payments into a sinking fund maintained by Wachovia (i.e. 25% of the annual bond payment including interest paid into the sinking fund every 3 months).

d.    The Series 2008 IRB issued by the Fairfax County Economic Development Authority in the aggregate principal amount of $6,000,000 for a project financed in Fairfax County, Virginia (Lorton).  Pursuant to a Loan Agreement dated April 1, 2008, GE Government Finance, Inc. ("GE") purchased the Series 2008 IRB and Ennstone agreed to be obligated to GE for monthly principal and interest payments.  The current amount asserted by GE under the Series 2008 IRB is approximately $2 million, although Ennstone contests the validity and amount of a $300,000 "prepayment" charge.

3.    The Equipment Loans

As the Debtors opened or acquired several new plant locations in the years leading up to the Petition Date, they entered into a series of new capital leases with a number of vendors, including SunTrust Equipment Financing & Leasing Corporation, Alter Moneta Corporation, and Caterpillar Financial Services Corporation (among others and as defined in the Plan, the "Equipment Vendors").  The

8

Debtors currently have an equipment base of more than 120 concrete mixers and other trucks and more than 100 wheel loaders, excavators, and other heavy equipment.  Most of this equipment is financed through the Equipment Vendors.  The Debtors also have a number of their concrete and aggregate plants financed through the Equipment Vendors.

The capital leases are financing arrangements and not true leases, as the Equipment Vendors have perfected liens on the equipment, and the security agreements or "leases" provide for $1.00 or some other nominal buyout.  The total amount due to the Equipment Vendors as of the Petition Date was in excess of $20 million, and the total projected payments under the capital leases in year 2009 would have been approximately $8.2 million.  The principal and interest payments scheduled under the capital leases thus became unaffordable as the Debtors' business activity and revenue decreased significantly in 2008.

## D.      Events Leading to Chapter 11 Filing

As indicated above, the Debtors rapidly expanded operations through a series of strategic acquisitions in 2005 through 2007 in order to take advantage of the construction boom, particularly in the residential housing market.  However, in late 2007, and through the entirety of 2008, there was a precipitous drop in new construction in the residential sector.

In an effort to maintain sales volume in such an economic climate, the Debtors shifted their focus away from the residential markets and towards the commercial markets.  However, the pricing and profit margins in the commercial markets are more competitive and less profitable, as compared to the residential markets.  These diminishing margins led to (among other things) a drop in the Debtors' EBITDA from approximately $15.0 million in 2007 to approximately $8.8 million in 2008.

Along with a drop in profitability, calendar year 2008 also saw the Debtors' liquidity begin to dry up.  Accordingly, the Debtors, in coordination with Ennstone plc and its advisors, undertook a series of steps to restructure the Debtors' business and operations.  In addition to layoffs and other cost-cutting measures, a debt restructuring plan was proposed to the Lender Group, the Equipment Vendors, and other parties, but this out-of-court restructuring plan was not accepted by all of the creditor constituents.  Additionally, the Debtors extensively marketed their business and assets for sale; however, no acceptable offer was received.

Given their insufficient liquidity to operate in the ordinary course of business, the expiration of a forbearance agreement with the Lender Group and the receipt of several notices of default from the Equipment Vendors, the Debtors filed for voluntary relief under chapter 11 of the Bankruptcy Code on February 24, 2009 (the "Petition Date").

## III.      THE CHAPTER 11 CASE

## A.      Commencement of the Chapter 11 Case and First Day Relief

On the Petition Date, the Debtors filed their respective petitions for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to manage their affairs as debtors in possession under chapter 11 of the Bankruptcy Code, subject to the control and supervision of the Bankruptcy Court.  No trustee or examiner has been requested or appointed in these Cases.

### 1.      Continuation of Business; Stay of Litigation and Collection Efforts

After the Petition Date, the Debtors continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Debtors are authorized to operate their business in the ordinary course, with transactions out of the ordinary course of

business requiring Bankruptcy Court approval. An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provides a debtor with the "breathing room" necessary to assess its business and develop a reorganization plan. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

  2.  First Day Motions and Orders

  Together with their petitions for relief, the Debtors filed a number of "first day" motions ("First Day Motions") on the Petition Date, seeking immediate relief. Orders were subsequently entered granting the relief sought in the First Day Motions (the "First Day Orders"). These First Day Orders authorized, among other things:

- Payment of certain pre-petition employee obligations (Docket No. 29);

- Maintenance of the Debtors current cash management systems and business forms (Docket No. 30);

- Interim use of Cash Collateral with the consent of the Lender Group (Docket No. 31);

- Joint administration of the Debtors' bankruptcy cases (Docket No. 36);

- Payment of certain pre-petition trust fund taxes (Docket No. 37);

- An extension of time for the filing of the Debtors' bankruptcy schedules and statements of financial affairs (Docket No. 38); and

- Establishment of procedures for providing adequate assurance of payment to certain utilities (Docket No. 39).

**B.  Case Administration**

  1.  Retention of Debtors' Professionals

  The Bankruptcy Court has authorized the Debtors' retention of various professionals, including: (i) McGuireWoods LLP as bankruptcy counsel (Docket No. 108); (ii) Huron Consulting Services, LLC as financial advisors (Docket No. 107); (iii) Motley's Auction & Realty Group as equipment appraiser (Docket No. 158); (iv) Piascik & Associates, P.C. as tax compliance advisors and tax consultants (Docket No. 287); (v) Harris Williams & Co. as investment banker (Docket No. 317); and (vi) Patton Boggs LLP as special counsel for immigration matters (Docket No. 293).

  2.  Use of Cash Collateral

  On February 25, 2009, the Debtors filed a motion for the entry of interim and final orders pursuant to sections 105, 361, 362, 363(c) and 363(e) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001 (i) authorizing the Debtors to use cash collateral, (ii) authorizing the Debtors to provide adequate protection in the form of replacement liens, (iii) scheduling a final cash collateral hearing, and (iv) granting certain other relief requested therein (the "Cash Collateral Motion") (Docket No. 12). The Cash Collateral Motion, in pertinent part, requested authority for the Debtors to utilize cash and proceeds of accounts and inventory subject to the first priority lien of the Lender Group.

On February 26, 2009, the Bankruptcy Court entered an interim order approving the Cash Collateral Motion (Docket No. 31). From time to time thereafter, the Bankruptcy Court, with the consent of the Lender Group, has entered additional interim orders extending the Debtors' authority to use Cash Collateral in accordance with the budgets attached to each order (Docket Nos. 104, 141, 255, 339, 418 and 469). Pursuant to these interim orders, the Lender Group has been granted, among other forms of adequate protection, interest payments, replacement liens, and other consideration.

3.    Appointment of Official Committee of Unsecured Creditors

On March 5, 2009, the Office of the United States Trustee filed its Appointment of Unsecured Creditors Committee and appointed three (3) members to serve on a single committee (the "Committee") to represent the interests of general unsecured creditors of the Debtors (Docket No. 58). The three (3) members of the Committee are: (i) Essroc Materials, Inc.; (ii) Reed Oil Company; and (iii) Woodfin Heating, Inc. d/b/a Foster Fuel & Cool Co. The Committee selected Whiteford Taylor & Preston, LLP as its counsel.

4.    Claims Bar Dates

The Bankruptcy Court established July 16, 2009 as the final date for creditors (other than governmental entities) to file proofs of claims against the Debtors. The final date for governmental entities to file proofs of claims against the Debtors was August 24, 2009 (collectively, the "Bar Dates"). Pursuant to Bankruptcy Rule 3003(c)(2), any creditor: (a) whose Claim (i) was not scheduled by the Debtors or (ii) was scheduled as disputed, contingent or unliquidated, and (b) who failed to file a proof of claim on or before the applicable Bar Date, will not be treated as a Creditor with respect to that Claim for purposes of voting on the Plan or receiving a distribution under the Plan.

A deadline for filing Administrative Claims has not been established as of the date of this Disclosure Statement. The Debtors have requested that the Bankruptcy Court establish the date that is thirty (30) days after the Effective Date as the Administrative Claim Bar Date.

5.    Schedules and Statements of Financial Affairs

On April 10, 2009 the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court (Docket No. 120).

6.    Extension of Exclusivity

Section 1121(b) of the Bankruptcy Code provides that, until 120 days after the order for relief, a debtor has the exclusive right to file a plan of reorganization (the "Exclusive Filing Period"). Additionally, section 1121(c)(3) of the Bankruptcy Code provides that exclusivity is extended for an additional 60 days (for a total of 180 days) to solicit acceptances of such plan (the "Exclusive Solicitation Period") if the debtor files a plan during the Exclusive Filing Period.

On June 23, 2009, the Bankruptcy Court entered an order extending the Debtors' Exclusive Filing Period from June 22, 2009 through and including August 21, 2009, and the Debtors' Exclusive Solicitation Period through and including October 20, 2009 (Docket No. 240). On August 19, 2009, the Court entered a bridge order (Docket No. 326) and on September 11, 2009, the Court entered a second order extending the Debtors' Exclusive Filing Period from August 21, 2009 through and including September 30, 2009, and the Debtors' Exclusive Solicitation Period through and including November 30, 2009 (Docket No. 380). On September 29, 2009, the Court entered a bridge order (Docket No. 429) and on October 13, 2009, the Court entered a third order extending the Debtors' Exclusive Filing Period from

September 30, 2009 through and including October 31, 2009 and the Debtors' Exclusive Solicitation Period through and including December 31, 2009 (Docket No. 441).

       7.      <u>Assumption or Rejection of Certain Executory Contracts and Unexpired Leases</u>

The Debtors have filed and the Court has approved four Omnibus Motions to Authorize the Rejection of Executory Contracts and Unexpired Leases (Docket Nos. 139, 177, 243, 437).[2] The remaining executory contracts the Debtors seek to reject will be listed in the Plan Supplement.

In addition, the Debtors filed motions to assume or reject their unexpired leases of non-residential real property within the time proscribed by section 365(d)(4) of the Bankruptcy Code. The Debtors filed an Omnibus Motion to Assume Unexpired Leases of Nonresidential Real Property and Establish Cure Amounts, which the Court approved on September 22, 2009 (Docket No. 414), with the exception of a lease in Mercer County, Pennsylvania which has been adjourned until December 22, 2009 due to a cure dispute. In addition, the Court approved Stipulations between the Debtors and Cecil Beachem's Assignees (Docket No. 470) and between the Debtors and Mr. and Mrs. Stephen B. Wilson (Docket No. 471) to assume their respective unexpired leases, retroactive to September 20, 2009. The Debtors also filed Motions to Authorize the Rejection of certain Lease Agreements which the Court approved on September 22, 2009 (Docket Nos. 411, 412 and 413). Finally, the Debtors filed a Motion to Extend Time to Assume or Reject an Unexpired Lease of Nonresidential Real Property with T. Harvey Trice, pursuant to Section 365(d)(4)(B)(ii), which the Court approved on September 22, 2009 (Docket No. 410), extending the time to assume or reject that lease until November 20, 2009, which the parties have agreed to further extend until at least December 10, 2009.

       8.      <u>Adequate Protection for Equipment Vendors</u>

Section 362(d) of the Bankruptcy Code provides that a party in interest may seek relief from the automatic stay for, among other things, lack of adequate protection of an interest in property of a debtor held by such a party in interest as collateral. In order for the automatic stay to remain in effect as to a party in interest's collateral a debtor must provide such party in interest with adequate protection, which may include, among other things, monthly or other periodic payments to the party in interest in order to offset the depreciation in value of the collateral.

Shortly after the Petition Date, the Debtors engaged the services of Motley's Auction & Realty Group to appraise the Debtors' financed equipment that is necessary to the reorganization (the "<u>Motley's Appraisal</u>"). During the course of these Cases, the Debtors have negotiated adequate protection payments with each of the Equipment Vendors based upon the rate of depreciation of such Equipment Vendor's Collateral, as determined in the Motley's Appraisal. The Debtors also consented to relief from the automatic stay, with respect to equipment unnecessary to the reorganization, allowing the Equipment

---

[2]      Ennstone owns a tract of real property in East Lackawannock Township, Pennsylvania (the "East Lackawannock Property"). The East Lackawannock Property is not part of the potential sale of Aggregates North referenced in section IV.B.3 herein, and is among the property of the Estate that is proposed to vest in Reorganized Ennstone pursuant to Section 11.1 of the Plan.

      A&G Investments, LLC ("A&G") has asserted, in a proof of claim and in an objection to the disclosure statement, that it has an option to purchase the East Lackawannock Property and that the option is not an executory contract. Ennstone disputes that A&G possesses a valid, enforceable option to purchase the East Lackawannock Property, and to the extent that an option or right of first refusal existed as of the Petition Date, it was rejected by Ennstone as part of an Order of Court dated October 8, 2009 (Docket No. 437). All claims and objections with respect to this issue are reserved and preserved, and may be raised in the context of plan confirmation.

Vendor to foreclose upon its Collateral.   A summary of the Consent Orders negotiated with the Equipment Vendors is as follows:

| Equipment Vendor | Consent Order |
|---|---|
| Wells Fargo Equipment Finance, Inc. | Consent to Relief from Stay for all equipment (Docket No. 199) |
| Volvo Financial Services | $15,000 per month (Docket No. 210) |
| Caterpillar Financial Services Corporation | (i) $12,865 per month for certain equipment, (ii) consent to Relief from Stay for certain equipment (Docket Nos. 246 and 327) |
| Komatsu Financial | $3,916 per month (Docket No. 273) |
| FCC Equipment Financing, Inc. | $8,375 per month (Docket No. 325) |
| Wachovia Bank, National Association | $10,717 per month (Docket No. 328) |
| Alter Moneta Corporation | (i) $15,000 per month for certain equipment, (ii) consent to Relief from Stay for certain equipment (Docket No. 337) |
| Sun Trust Equipment Financing & Leasing Corp. | $48,779 per month (Stipulation pending) |
| Manufacturers and Traders Trust Company | $7,332 per month (Stipulation pending) |

Just as the Debtors utilized the depreciation rate information in the Motley's Appraisal to determine the appropriate amount of adequate protection to the Equipment Vendors in the Consent Orders, the Debtors have utilized the fair market value information in the Motley's Appraisal to determine the appropriate amount of secured claims to each Equipment Vendor in the Chapter 11 Plan.

9.      Neale Property Settlement

Ennstone and King William Sand & Gravel Company ("KWS&G") were parties to a promissory note, which required KWS&G to either pay a total of approximately $2 million or convey 200 acres of real estate in Carolina County, Virginia known as the "Neale Property" to Ennstone on the maturity date (the "Promissory Note").  Ennstone and KWS&G were also parties to a Stock Option/Stock Purchase Agreement, whereby Ennstone had an option to acquire the stock of KWS&G from John D. Fulks ("Fulks"), who is the sole shareholder of KWS&G, for $7 million (the "Option Agreement").  The Option Agreement was terminated by KWS&G and Fulks prior to the Petition Date, thus triggering KWS&G's election under the Promissory Note.

On April 14, 2009, Ennstone and KWS&G filed with the Court a Joint Motion for Entry of Stipulation and Consent Order, whereby KWS&G agreed to convey, and Ennstone agreed to accept, the Neale Property in full satisfaction of the obligations of KWS&G under the Promissory Note.  On April 24, 2009, Wachovia filed a Partial Objection to the Joint Motion and Consent Order, asserting that it was an assignee of the Promissory Note and thus entitled to the Neale Property, or alternatively, that Wachovia has a security interest in the Neale Property as a "general intangible" because the property is a "proceed" of the Promissory Note.  The Debtors and the Committee disputed Wachovia's objection, and a hearing to resolve this dispute has been continued throughout the Case.

The Plan provides for a settlement and compromise of the Neale Property dispute, by and between the Debtors, the Committee, and Wachovia, such that the Joint Motion and Consent Order can be approved and the Neale Property can be transferred from escrow to Reorganized Ennstone, with the Lender Group retaining a lien against the Neale Property as part of the New Term Loan Agreement.

        10.     The Recharacterization Settlement

On or about May 11, 2009, Ennstone Plc ("Plc") and Bruntcliffe Aggregates Plc ("Bruntcliffe"), filed Proofs of Claim in the total amount of $73,824,933.65. The claims consisted of alleged parent company loans, management fees, allocation of overhead, and "intra group financing." The Debtors and the Committee challenged the Proofs of Claim and asserted that the claims represented capital contributions and therefore should be recharacterized as equity interests.

On October 14, 2009, the Debtors filed a motion to approve a settlement between Ennstone, the Committee, and the Administrators, acting for Plc and Bruntcliffe, which the Bankruptcy Court approved on November 4, 2009 (Docket No. 478). The proposed settlement provides, inter alia, for the Proofs of Claim to be recharacterized as Equity Interests and for the Debtors to pay Plc and Bruntcliffe a total of $250,000, including $200,000 upon Bankruptcy Court approval of the settlement and $50,000 upon the earlier of (a) the Effective Date of the Plan, and (b) December 31, 2009. The Claims subject to the Recharacterization Settlement have been designated as Class 7 under the Plan.

**C.**    **Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Guidelines**

On April 17, 2009, the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code. An authorized representative of the Debtors attended the meeting. Additionally, the Debtors have filed all monthly operating reports and timely paid all statutory quarterly fees as required by the Office of the United States Trustee. To the best of the Debtors knowledge, and upon information and belief, the Debtors have complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as any local rules of the Bankruptcy Court and deadlines of the United States Trustee.

## IV.    SUMMARY AND OVERVIEW OF THE PLAN

The Plan governs the treatment of claims against, and equity interests in, each of the Debtors in these Chapter 11 Cases. In developing the Plan, the Debtors gave due consideration to various exit alternatives, and engaged in significant negotiations with the creditors who will be the major economic stakeholders in Reorganized Ennstone. The Plan deleverages the Debtors' balance sheet, enables the Debtors to satisfy their restructured secured obligations, provides for the potential sale of certain Non-Core Assets, and positions Reorganized Ennstone to become a more valuable enterprise as the residential and commercial construction market improves. The Plan further provides for an allocation of preferred and common stock that will allow the various creditor constituents to share the upside in value that is projected to occur in 2011-2012.

The following table provides a summary of the classification and treatment under the plan of all Claims and Equity Interests. The summary is qualified in its entirety by the more detailed information in the Plan and Disclosure Statement. The total amount of the Claims reflects the Debtors' current estimate, based upon the Debtors' Schedules, books and records; the Proofs of Claim filed on the Claims Register; and the informed opinion of the Debtors' Professionals of the likely amount of certain objectionable claims after resolution by settlement or litigation. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| **Unclassified** | Unimpaired |
|---|---|
| **Administrative Claims, including Section 503(b)(9) Claims** | Allowed Claims will be paid in full on the later of the Effective Date or after the Administrative Claim is Allowed.  The bar date for Administrative Claims is 30 days after the Effective Date. |
| Total Estimated Allowed Claims<br>Recovery % | $600,000<br> 100% |
| **Professional Fee Claims** | Allowed Claims will be paid upon Court approval of final fee applications.  Final fee applications must be filed no later than 30 days after the Effective Date. |
| Total Estimated Allowed Claims<br>Recovery % | $250,000<br> 100%<br><br>does not include amounts previously allowed and paid<br><br>expected to be partially satisfied from existing retainers |
| **Priority Tax Claims** | Allowed Claims will be paid, at the option of Reorganized Ennstone, either in full on the Effective Date or installment payments over a period of 5 years after the Petition Date, plus interest, pursuant to sections 511 and 1129(a)(9) of the Bankruptcy Code. |
| Total Estimated Allowed Claims<br>Recovery % | $250,000<br> 100% |
| **U. S. Trustee Fees** | Paid on a quarterly basis as required by statute until the case is closed. |
| Total Estimated Allowed Claims<br>Recovery % | $10,000<br> 100% |

| **Class 1** | Unimpaired |
|---|---|
| **Other Priority Claims** | Allowed Claims, if any, will be paid in full on the later of the Effective Date or after the Priority Claim is Allowed. |
| Total Estimated Allowed Claims<br>Recovery % | $0.00<br> 100% |

| **Class 2** | Unimpaired |
|---|---|
| **IRB Secured Claims**<br><br>(a)  Virginia Small Business Financing Authority (Series 1999)<br><br>(b)  Virginia Small Business Financing Authority, (Series 2001)<br><br>(c)  Lawrence County Industrial Development Authority (Series 1999) | Allowed Claims will be paid in full, either (a) in accordance with the terms of the IRB documents, or (b) from the proceeds of the sale of the Collateral which secures the IRB. |
| Total Estimated Allowed Claims<br>Recovery % | $2,800,000<br> 100% |

| **Class 3** | Impaired |
|---|---|
| **Lender Group Secured Claim**<br><br>(a)  Wachovia Bank (administrative agent)<br><br>(b)  Fulton Bank<br><br>(c)  Stellar One Bank | Allowed Claims will be paid (a) the net proceeds from the sale of Non-Core Assets, (b) the payments due under the New Term Loan, and (c) $5 million in Preferred Stock, convertible at the option of the Lender Group to 40% of the New Common Stock of Reorganized Ennstone. |
| Total Estimated Allowed Claims<br><br>Estimated Recovery % | $45,000,000 secured<br>$15,000,000 unsecured<br> 75% |

| **Class 4** | Impaired |
|---|---|
| **Equipment Vendor Secured Claims**<br><br>(a)  SunTrust Equipment Financing & Leasing Corp.<br>(b)  Alter Moneta Corporation<br>(c)  Caterpillar Financial Services Corporation<br>(d)  Wachovia Bank, National Association<br>(e)  Volvo Financial Services<br>(f)  FCC Equipment Financing, Inc.<br>(g)  Manufacturers and Traders Trust Company<br>(h)  Komatsu Financial<br>(i)  GE Government Finance, Inc.<br>(j)  Carter Machinery Company, Inc.<br>(k)  CNH Capital America, LLC | Allowed Claims will be paid either (a) the fair market value of their Collateral from the sale of Non-Core Assets, (b) the payments due under the New Equipment Loans, or (c) a surrender of the Collateral in full satisfaction of the Secured Claim; and (d) a Pro Rata Share of 40% of the New Common Stock of Reorganized Ennstone, shared with the holders of the Allowed Class 5 Claims, on account of their Unsecured Deficiency Claims. |

| (l) General Electric Capital Corporation<br>(m) GMAC Inc.<br>(n) Ford Motor Credit Company LLC | |
|---|---|
| Total Estimated Allowed Claims | $14,000,000 secured<br>$ 8,000,000 unsecured |
| Estimated Recovery % | 75%, including value of property surrendered |

| **Class 5** | <u>Impaired</u> |
|---|---|
| **General Unsecured Claims** | Allowed Claims will be paid (a) a Pro Rata Share of 40% of the New Common Stock of Reorganized Ennstone, shared with the Allowed Unsecured Deficiency Claims in Class 4, (b) a Pro Rata Share of Cash from the Unsecured Claims Fund, and (c) a Pro Rata Share of Cash from the Litigation Trust |
| Total Estimated Allowed Claims | $ 8,000,000 |
| Estimated Recovery % | 6-12% |

| **Class 6** | <u>Impaired</u> |
|---|---|
| **Convenience Claims** | Allowed Claims will be paid 10% up to $10,000 on the Effective Date or after the Convenience Claim is Allowed. |
| Total Estimated Allowed Claims | $800,000 |
| Recovery % | 10% |

| **Class 7** | <u>Impaired</u> |
|---|---|
| **Parent Company Claims** | Pursuant to the Recharacterization Settlement, the Administrator of the Parent Company in the United Kingdom will be paid $200,000 upon Bankruptcy Court approval of the settlement and $50,000 on the earlier of (a) Effective Date or (b) December 31, 2009. |
| Total Estimated Allowed Claims | $0.00 |
| Recovery % | less than 1% |

| **Class 8** | Impaired |
|---|---|
| **Equity Interests** | Interests shall be cancelled and receive no distribution |
| Total Estimated Allowed Claims <br> Recovery % | N/A <br>  0% |

**A.**     **Classification and Treatment of Allowed Claims and Equity Interests**

1.     Unclassified Allowed Claims

The Bankruptcy Code does not require administrative and certain priority claims to be classified under a chapter 11 plan.  Accordingly, Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and statutory fees payable to the United States Trustee have not been classified in the Plan. The Plan proposes to treat such Claims as follows:

a.     Administrative Expense Claims

The Debtors have remained current with their Administrative Claims, with the exception of a few small disputed claims.  The Debtors also have acknowledged certain Section 503(b)(9) Claims totaling approximately $116,755.46, pursuant to written agreement or Court Order, which shall be paid on the Effective Date.  The Debtors have requested that the Bankruptcy Court establish an Administrative Claim Bar Date to occur thirty (30) days after the Effective Date, by which time all Administrative Claims which arose prior to the Confirmation Date must be filed or they will be forever barred.  Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, on the Effective Date, or as soon as reasonably practicable after an Administrative Claim is Allowed, each holder of an Allowed Administrative Expense Claim, including Allowed Section 503(b)(9) Claims, shall receive in full satisfaction of such claim, an amount in Cash equal to the Allowed amount of such Claim. Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business shall be paid the full amount of their Claim in accordance with the ordinary business terms.

b.     Professional Fee Claims.  Pursuant to an Administrative Order Establishing Interim Compensation Procedures, various Professionals of the Debtors and the Committee have been paid compensation of 85% of fees and 100% of expenses on a monthly basis, and the 15% accrued holdback every 3 months upon interim fee applications filed with the Bankruptcy Court.  All fees and expenses approved and paid pursuant to the interim compensation procedures are subject to final approval by the Bankruptcy Court.  All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on Reorganized Ennstone no later than thirty (30) days after the Effective Date.  After notice and a hearing, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and to the extent not paid by the Debtors under the interim compensation procedures, shall be paid by Reorganized Ennstone.  After the Effective Date, Reorganized Ennstone shall, in the ordinary course of business, pay the reasonable professional fees and expenses related to implementation and consummation of the Plan.  Reorganized Ennstone is not, however, responsible for the legal fees and expenses incurred by the Litigation Trust, other than fees and expenses relating to the Fulks Litigation.  Bankruptcy Court approval is not required for any post-Effective Date professional fees and expenses, although the Bankruptcy Court retains jurisdiction to resolve any post-Effective Date fee disputes related to implementation and consummation of the Plan.

c.      Priority Tax Claims.  A total of approximately $550,000 in Priority Tax Claims has been filed by various government entities.  The Debtors dispute a majority of the Priority Tax Claims as overstated, or inclusive of amounts already paid or not yet due.  The Debtors will file objections to the Disputed Priority Tax Claims, and to the extent such claims are Allowed they shall receive Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or at the option of the Debtors, cash in an aggregate amount of such Allowed Priority Tax Claim payable in equal annual installment payments over a period not more than five (5) years after the Petition Date, together with interest at a fixed annual rate, pursuant to sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.  Secured Tax Claims shall receive the same treatment as Priority Tax Claims, pursuant to section 1129(a)(9)(D) of the Bankruptcy Code.

d.      Fees Under 28 U.S.C. §1930.  All fees payable in the Cases under 28 U.S.C. §1930 will, if not previously paid in full, be paid in Cash on the Effective Date and will continue to be paid by Reorganized Ennstone as required under 28 U.S.C. §1930 until such time as an order is entered by the Bankruptcy Court closing the Cases.

2.      Classification and Treatment of Allowed Claims and Equity Interests

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is placed in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.  The Plan classifies Claims and Equity Interests as follows:

a.      Class 1:  Other Priority Claims

The Claims in Class 1 are of the type identified in section 507(a) of the Bankruptcy Code that are entitled to priority treatment, other than Administrative Claims and Priority Tax Claims.  A number of Priority Claims were paid pursuant to the First Day Orders listed in Section III.A.2 hereof.  A number of unsecured trade claimants have filed Priority Claims without the proper statutory basis, and the Debtors will file objections to those Disputed Priority Claims.  The Debtors believe that there will be no Allowed Other Priority Claims in Class 1.

Class 1 is Unimpaired under the Plan, and each holder of a Class 1 Claim is conclusively presumed to have accepted the Plan, and therefore is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, in full and final satisfaction and discharge of each Allowed Other Priority Claim, each holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date and the date such Other Priority Claim becomes Allowed, or as soon as practicable thereafter.

b.      Class 2:  IRB Secured Claims

The Claims in Class 2 are the holders of the tax-exempt bonds, or IRBs, as listed and described in Section II.C.2 hereof.  Each holder of an IRB Secured Claim shall be considered a sub-class within Class 2.

Class 2 is Unimpaired under the Plan, and each holder of a Class 2 Claim is conclusively presumed to have accepted the Plan, and therefore is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed IRB Secured Claim agrees to a different treatment, in full and final satisfaction and discharge of each Allowed IRB Secured Claim, at the option of the Debtors, upon consultation with the Lender Group:

(i)    each Allowed IRB Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code on the Effective Date, provided that the Debtors may, with the approval of the Lender Group, and consistent within the terms and provisions of the IRB documents, amend the IRBs to defer principal and/or payments and/or extend the maturity dates; or

(ii)    each holder of an IRB Secured Claim shall receive Cash necessary to satisfy and retire the IRB, from the proceeds of the sale of any property financed by the IRB which serves as Collateral for the Allowed IRB Secured Claim, pursuant to section 363 of the Bankruptcy Code and Section 7.1 of the Plan; and

(iii)    all liens and security interests in the Collateral granted by Debtors to secure the indebtedness described in the IRB Secured Claims shall continue as first and senior liens and security interests in the assets of Reorganized Ennstone securing the Allowed IRB Secured Claims following the vesting of assets in Reorganized Ennstone under section 11.1 of the Plan.

c.    Class 3:  Lender Group Secured Claims

The Claims in Class 3, as described in Section II.C.1 hereof, have been Allowed pursuant to the Cash Collateral Orders.  Distributions on account of the Allowed Class 3 Claims shall be made by Reorganized Ennstone to Wachovia, as the administrative agent of the Lender Group.

Class 3 is Impaired under the Plan, and is entitled to vote to accept or reject the Plan.

Except to the extent that the holders of the Allowed Lender Group Secured Claim agrees to a different treatment, in full and final satisfaction and discharge of the Allowed Lender Group Secured Claim, the holders of the Allowed Lender Group Secured Claim shall receive:

(i)    the payments due under the New Term Loan and the Non-Core Asset Sale Note.  The net proceeds from the sale of Non-Core Assets received by the Lender Group will be applied against and satisfy the Non-Core Asset Sale Note.  The principal amount due under tranche B of the New Term Loan will be reduced by one-half of any net proceeds from the sale of Non-Core Assets received by the Lender Group in excess of $10.0 million.  The principal amount due under tranche B of the New Term Loan will increase to the extent the Non-Core Asset Sale Note is not satisfied by June 30, 2010, unless the maturity date of the Non-Core Asset Sale Note is extended by the Lender Group;

(ii)    the Preferred Stock;

(iii)    to secure Wachovia's repurchase obligations under the IRBs, Reorganized Ennstone shall continue to make quarterly payments into a sinking fund maintained by Wachovia, with each payment being at the rate of 25% of the annual bond payment obligation, with the exception of the quarterly sinking fund payments due October 1, 2009 and January 1, 2010 on account of the Lawrence County Industrial Development bonds which Wachovia has agreed to defer until April 1, 2010; and

(iv)    the New Term Loan and the Non-Core Asset Sale Note shall be secured by all assets of Reorganized Ennstone.  In furtherance but not in limitation of the foregoing, all liens and security interests in the Collateral granted by Debtors to secure the indebtedness described in the Lender

Group Secured Claim shall continue as first and senior liens in the assets of Reorganized Ennstone (but subordinate to purchase money security interests held by Class 4 Allowed Equipment Vendor Secured Claims) following the vesting of assets in Reorganized Ennstone under Section 11.1 of the Plan, securing the New Term Loan, the Non-Core Asset Note and Wachovia's repurchase obligations under the IRBs.

    d.  <u>Class 4:  Equipment Vendor Secured Claims</u>

   The Claims in Class 4 are held by the Equipment Vendors.  As described in Section II.C.3 and III.B.8 hereof, the Equipment Vendors have first priority liens on various items of equipment, and the Debtors have been paying the Equipment Vendors adequate protection based upon the amounts of monthly depreciation as determined in the Motley's Appraisal.

   The Plan provides for payments to the Equipment Vendors based upon the fair market values determined in the Motley's Appraisal, either from the proceeds of sale for the equipment Collateral being sold, or in the form of the New Equipment Loans for the equipment Collateral being retained by Reorganized Ennstone.  Alternatively, the Debtors may surrender Collateral to the Equipment Vendors at any time prior to the Effective Date, thus reducing the amount of the New Equipment Loan by the fair market value thereof.  After the equipment Collateral is either sold, retained or surrendered as of the Effective Date, the Equipment Vendors have sixty (60) days to liquidate the surrendered Collateral and submit a Deficiency Claim which will determine the Pro-Rata allocation of New Common Stock shared with the holders of Class 5 Claims.  The Debtors estimate that the aggregate amount of Allowed Class 4 Claims will be approximately $14 million on a secured basis (reduced by certain proceeds of the Non-Core Asset Sales) and $8 million on an unsecured basis.

   Class 4 is Impaired under the Plan, and each holder of a Class 4 Claim is entitled to vote to accept or reject the Plan.  Each holder of an Equipment Vendor Secured Claim shall be considered a sub-class within Class 4, each of which is a separate Voting Class, as follows:

| | |
|---|---|
| Class 4-A | SunTrust Equipment Financing & Leasing Corp. |
| Class 4-B | Alter Moneta Corporation |
| Class 4-C | Caterpillar Financial Services Corporation |
| Class 4-D | Wachovia Bank, National Association |
| Class 4-E | Volvo Financial Services |
| Class 4-F | FCC Equipment Financing, Inc. |
| Class 4-G | Manufacturers and Trading Trust Company |
| Class 4-H | Komatsu Financial |
| Class 4-I | GE Government Finance, Inc. |
| Class 4-J | Carter Machinery Company, Inc. |
| Class 4-K | CNH Capital America, LLC |
| Class 4-L | General Electric Capital Corporation |
| Class 4-M | GMAC Inc. |
| Class 4-N | Ford Motor Credit Company LLC |

   Except to the extent that a holder of an Allowed Equipment Vendor Secured Claim agrees to a different treatment, in full and final satisfaction and discharge of each Allowed Equipment Vendor Secured Claim, each holder of an Allowed Equipment Vendor Secured Claim shall receive:

      (i)  the fair market value of any equipment serving as Collateral for the Allowed Equipment Vendor Secured Claim which is sold pursuant to section 7.1 of the Plan and section 363 of the Bankruptcy Code, payable in Cash from the proceeds of sale;

      (ii)  the payments due under the New Equipment Loans;

(iii)    the Debtors reserve the right to surrender Collateral to an Equipment Vendor at any time prior to the Effective Date, and thereby reduce the New Equipment Loan to that Equipment Vendor by the fair market value of such Collateral;

(iv)    for purposes of subsections (i) through (iii) immediately above, with respect to Classes 4-A through 4-H, the fair market value of the Collateral of each Equipment Vendor is set forth on Exhibit 2 of the Plan;

(v)    notwithstanding any other term or provision of the Plan, with respect to the Class 4-I Claim of GE Government Finance Inc., such claim shall be, and hereby is, Allowed as a Secured Claim in the amount of $1.7 million and a Deficiency Claim in the amount of $300,000.00. The Allowed Secured Claim shall be amortized at the same interest rate and over the same term as set forth in the Non-taxable Loan Agreement dated April 1, 2008. If the Lorton property referenced in section 7.1 of the Plan and section IV.B.1 hereof is sold on or before June 30, 2010, the balance of the Allowed Secured Claim shall be paid directly from the proceeds of sale;

(vi)    with respect to the Class 4-J Claim of Carter Machinery Company, Inc., such claim will be Allowed as a Secured Claim in the amount of $101,306.11 and a Deficiency Claim in the amount of $225,966.42, pursuant to the terms of a Stipulation and Consent Order to be filed with the Court;

(vii)    with respect to the Class 4-K Claim of CNH Capital America, Inc. ("CNH") and Class 4-L Claim of General Electric Capital Corporation ("GECC"), the Debtors will surrender the Collateral subject to such Claims, and CNH and GECC shall have 60 days from the Effective Date to amend their Proofs of Claim filed in these Cases to assert Deficiency Claims;

(viii)    with respect to the Class 4-M Claim of GMAC Inc. and Class 4-N Claim of Ford Motor Credit Company LLC ("Ford"), which are secured in various light vehicles owned by the Debtors, GECC and Ford shall have Allowed Secured Claims based upon the blue book values of each vehicle as set forth on Exhibit 3 of the Plan, with interest at the rate of 5.5%, amortized over a 3-year period from the Effective Date;

(ix)    each holder of an Allowed Equipment Vendor Secured Claim shall be entitled to a Pro Rata Share of 40% of the New Common Stock to be held by the Distribution Agent, based upon the amount of its Allowed Deficiency Claim, which Deficiency Claim shall be filed with the Bankruptcy Court within sixty (60) days of the Effective Date and become an Allowed Claim unless the Debtors file an objection to the deficiency claim within thirty (30) days thereafter; and

(x)    all existing purchase money security interests in or senior liens on the Collateral granted by Debtors to secure the indebtedness described in each of the Equipment Vendor Secured Claims shall continue as purchase money security interests or senior liens on the Collateral of Reorganized Ennstone securing each of the Allowed Equipment Vendor Secured Claims following the vesting of assets in Reorganized Ennstone under section 11.1 of the Plan.

The Debtors may further memorialize the treatment specified above by stipulation with any of the Equipment Vendors, and provide for a longer period of time to liquidate any of the surrendered Collateral for purposes of establishing a Deficiency Claim, or estimate the Claims, pursuant to section 502(c) of the Bankruptcy Code or by consent.

     e.      <u>Class 5:  General Unsecured Claims</u>

The Claims in Class 5 consist of vendor claims, lease and contract rejection damage claims, and other general unsecured claims which are Allowed in excess of $10,000 who do not elect Convenience Class treatment.  The Claims in Class 5 do not include the unsecured Deficiency Claims in Class 4, although the Allowed Deficiency Claims in Class 4 and the Allowed General Unsecured Claims in Class 5 will be combined in determining the appropriate Pro-Rata allocation of the 40% in New Common Stock.  The Debtors estimate that the aggregate amount of Allowed Class 5 Claims will be approximately $8 million.  Distributions to holders of Allowed Class 5 Claims shall be made from the Litigation Trust and in accordance with its terms.

Class 5 is Impaired under the Plan, and each holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, in full and final satisfaction and discharge of each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the following:

     (i)      40% of the New Common Stock to be held by the Distribution Agent as nominee and distributed from the Litigation Trust in the form of Cash to Allowed General Unsecured Claimants and to Equipment Vendors on account of their Allowed Deficiency Claims, on a Pro Rata basis, when the shares of New Common Stock have been sold or otherwise monetized;

     (ii)      the Unsecured Claims Fund;

     (iii)      recoveries on the Avoidance Actions and any other Causes of Action assigned to the Litigation Trust; and

     (iv)      recoveries on the Fulks Litigation assigned to the Litigation Trust, which shall be shared with Reorganized Ennstone as follows:

     (a)      the Litigation Trust will retain the first $300,000.00 recovered in the Fulks Litigation plus up to $50,000.00 of the costs and expenses of litigation and collection relating thereto; and

     (b)      the Litigation Trust and Reorganized Ennstone will share equally all amounts recovered in the Fulks Litigation in excess of subpart (a) above.  To the extent that the Litigation Trust receives less than $200,000.00 from the Fulks Litigation, after deducting up to $50,000.00 of the costs and expenses of litigation and collection, Reorganized Ennstone will agree to pay the deficiency in accordance with the terms of the Litigation Trust. Notwithstanding the language in Article 4.3 of the Plan and any loan documents, the Lender Group consents to this payment provided no Event of Default has occurred under the New Term Loan.

Distributions to holders of Allowed Class 5 Claims shall be made from the Litigation Trust and in accordance with its terms.

f.    Class 6:  Convenience Claims

The Claims in Class 6 consist of General Unsecured Claims which are either Allowed in the amount of $10,000 or less, or are Allowed in an amount in excess of $10,000 but elect to reduce the Allowed Claim to $10,000 in order to receive Class 6 Treatment.

Class 6 is Impaired under the Plan, and each holder of a Class 6 claim is entitled to vote to accept or reject the Plan.

In full and final satisfaction and discharge of each Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 10% of the Allowed Convenience Claim on the later of the Effective Date or the date such Convenience Claim becomes Allowed, or as soon as practicable thereafter.

g.    Class 7:  Parent Company Claims

The Claims in Class 7 consist of the General Unsecured Claims filed by the Administrator on behalf of Bruntcliffe Aggregates Plc in the amount of $68,033,747.79 and by Ennstone Plc in the amount of $5,781,185.86.  The Debtors and the Committee asserted that the Parent Company Claims should not be Allowed as General Unsecured Claims, but should be recharacterized as Equity Interests.  The Debtors, the Committee, and Deloitte have settled this dispute in the form of the Recharacterization Settlement, whereby the Administrators agreed to the recharacterization of the Parent Company Claims as Equity Interests, and the Debtors agreed to pay the Administrators a total of $250,000, of which $200,000 is to be paid upon Court approval of the settlement and $50,000 is to be paid on the earlier of (a) the Effective Date or (b) December 31, 2009.

Class 7 is Impaired under the Plan, and each holder of a Class 7 Claim is entitled to vote to accept or reject the Plan.

h.    Class 8:  Equity Interests

Class 8 consists of the Equity Interests in the Debtors.

Class 8 is impaired under the Plan, and each holder of an Equity Interest in Class 8 shall be deemed to have rejected the Plan.

On the Effective Date, all Equity Interests shall be cancelled and extinguished, and each Person holding a Class 8 Equity Interest shall neither receive nor retain any property or interest in property on account of such Equity Interest.

**B.    Sale of Non-Core Assets**

In conjunction with the Plan, the Debtors intend to sell certain assets to third parties free and clear of liens and encumbrances, via private sale pursuant to sections 363 and/or 1123(a)(5)(D) of the Bankruptcy Code.  Because these assets, while valuable, are not necessarily core to the Reorganized Ennstone business plan, such assets are referred to as the "Non-Core Assets."  Substantially all of the proceeds from the sale of the Non-Core Assets will be paid to creditors with Allowed Secured Claims to satisfy liens against the real estate, equipment, and other assets being transferred.  The Debtors may file a separate motion for sale approval or may amend the Plan prior to the Confirmation Hearing to provide for a sale through the Plan.  If the Debtors, however, do not reach final agreement, fail to obtain Bankruptcy Court approval, or fail to close the contemplated transactions, the Non-Core Assets will be retained by the

Debtors and vest in Reorganized Ennstone subject to the liens of the Allowed Secured Claimants in the same priority that existed prior to the Petition Date.

The Non-Core Assets include the following:

1.      Lorton.  Ennstone has executed a letter of intent to sell its concrete operation in Lorton, Virginia, including real estate and certain equipment, to SRT Enterprises, LLC for a purchase price of $4.2 million.  The proceeds of sale will be sufficient to satisfy the Class 4-I Claim of GE, and reduce the Non-Core Asset Sale Note by more than $2 million.

2.      Trice.  Ennstone has executed a letter of intent to sell its aggregates operation in King and Queen County, Virginia, to Egypt Farms Sand & Gravel LLC for a purchase price of $700,000.00.  The sale would include an assignment to the buyer of a certain lease of non-residential real property.  The landlord, T. Harvey Trice, has filed a cure claim in the amount of $287,486.40, but has agreed to reduce the cure claim to $50,000.00, contingent upon the sale.  The net proceeds of the sale and assignment will further reduce the Non-Core Asset Sale Note.

3.      Pennsylvania Aggregates.  Ennstone has received a letter of intent to acquire its Aggregates North division in Western Pennsylvania, which includes 6 sand and gravel quarries and related leases, extracted inventory, and various plant and mobile equipment, for a purchase price of approximately $9.35 million.  The proceeds of this potential sale will satisfy certain Equipment Vendor Allowed Secured Claims and retire the Series 1999 Lawrence County IRB.  Remaining net proceeds will be payable to the Lender Group on account of the Non-Core Asset Sale Note and the New Term Loan.

4.      Other.  On September 16, 2009, the Bankruptcy Court approved the sale of plant equipment in Slippery Rock, Pennsylvania, for a total purchase price of $400,000, which has been paid to the Lender Group and will be fully credited to the obligations under the Non-Core Asset Sale Note.  In addition, the Debtors have sold a certain parcel of real estate consisting of approximately 72 acres of undeveloped land in the Townships of Worth and West Liberty, Butler County, Pennsylvania for a gross purchase price of $100,000.00, resulting in a credit to the obligations under the Non-Core Asset Sale Note of $88,408.50.

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan, including the sale of Non-Core Assets referenced immediately above, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

## C.      The New Term Loan and Non-Core Asset Sale Note

A major component of the Debtors' standalone Chapter 11 Plan is a restructuring of the senior secured debt with the consent of the Lender Group, which as set forth in sections II.C.1 and III.B.2 hereof, was owed a total of approximately $59.8 million as of the Petition Date and provided the Debtors with the use of Cash Collateral during the Cases.

The Lender Group has agreed to restructure the pre-petition Credit Agreement in the form of a New Term Loan in the original principal amount of $35 million, secured by a lien on the Reorganized Debtors' assets, and payable in two tranches, as follows:  (a) $20 million bearing interest at LIBOR plus 2% per annum (with a floor of 7%), payable interest-only through June, 2010 and then principal and

interest payments starting in July, 2010 based upon an amortization schedule of 8 years and a maturity date of December 31, 2012; and (b) $15 million with interest of 8% per annum accruing as of the Effective Date, which shall be payable in kind, and principal and interest payments starting in January, 2012 based upon an interest rate of LIBOR plus 2% per annum (with a floor of 7%), an amortization schedule of 10 years, and a maturity date of December 31, 2012. The New Term Loan will also include amortization deferment options, an excess cash sweep feature, and recapture provisions for any other significant asset sales.

The principal amount of the New Term Loan may increase or decrease depending on the amount of net proceeds received by the Lender Group from the sale of Non-Core Assets described in Section IV.B. The Plan provides for a Non-Core Asset Sale Note to be held by the Lender Group in the amount of $10 million, which will be non-interest bearing through December 31, 2009 and bear interest at the rate of 5.5% per annum (payable in kind) through June 30, 2010, or such time which may be extended by consent of the Lender Group and Reorganized Ennstone. Proceeds from the Non-Core Asset Sales paid to the Lender Group prior to June 30, 2010 (or such extended period) will reduce the balance of the Non-Core Asset Sale Note. Provided that proceeds from the Non-Core Asset Sales are paid to the Lender Group of at least $10 million (including the $488,408.50 already received from the sale of Non-Core Assets referenced in section IV.B.4 hereof), the Non-Core Asset Sale Note will be retired. If less than $10 million is paid to the Lender Group from the Non-Core Asset Sales, on July 1, 2010 (unless extended) the unpaid balance of the Non-Core Asset Sale Note will be converted to tranche B of the New Term Loan. To the extent that proceeds from the Non-Core Asset Sales are paid to the Lender Group in excess of $10 million, one-half of such excess will be applied to reduce the principal amount due under tranche B of the New Term Loan.

Reorganized Ennstone shall enter into the New Term Loan and Non-Core Asset Sale Loan on the Effective Date. The Loan documents will be included in the Plan Supplement. Confirmation of the Plan shall be deemed approval of the New Term Loan and the Non-Core Asset Sale Loan, and authorization for Reorganized Ennstone to enter into and execute the Loan documents.

**D.    The Litigation Trust**

The Litigation Trust is a grantor trust for federal income tax purposes and has been created for the benefit of the holders of Allowed Deficiency Claims in Class 4 and Allowed General Unsecured Claims in Class 5. The trustee of the Litigation Trust will be selected by the Committee, and the trustee as well as the trustee's professionals will be paid from trust assets as set forth in the Trust Agreement.

The Litigation Trust will perform, inter alia, the following functions:

- litigation of Avoidance Actions assigned to the Trust;

- litigation of any other Causes of Action assigned by the Debtors to the Trust;

- hold 40% of the New Common Stock as nominee for Allowed Unsecured Claims in Classes 4 and 5; and

- distribute Cash from the trust to holders of Allowed Claims in Class 5 in accordance with the terms of this Plan.

The operation of the Litigation Trust shall be governed by the terms of the Trust Agreement in all respects. The Trust Agreement will be included in the Plan Supplement.

**E.    Substantive Consolidation**

26

The Plan provides for the substantive consolidation of the Debtors, and for the merger of Ennstone and King William Mattaponi.  Substantive consolidation is an equitable remedy that a bankruptcy court may be asked to apply in chapter 11 cases involving affiliated debtors.  Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors.  All of the debtors in a substantively consolidated group are treated as if they were a single corporate and economic entity.  Consequently, a creditor of one substantively consolidated debtor is treated as a creditor of a substantively consolidated group of debtors.  Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of such debtors, the deemed elimination of inter-company claims, individual debtor equity or ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees, and the payment of allowed claims from a common fund.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of Ennstone and King William Mattaponi for all purposes related to the Plan, including for purposes of voting, confirmation and distribution.

The only significant asset of King William Mattaponi, as listed on the Schedules, is a building, plant, and lease of real property in King William County which has been assumed.  The only Proofs of Claim filed against King William Mattaponi are (i) the Secured Claim of the Lender Group; (ii) the landlord Hays Farm Limited Partnership claim, which has been cured; (iii) a $100.00 priority claim filed by the Internal Revenue Service which has been amended to $0.00; and (iv) a general unsecured claim of $2,765.00.  The Debtors accordingly submit that creditors would not be prejudiced to any significant degree by the Debtors' substantive consolidation which is consistent with creditors having dealt with the Debtors as a single economic entity, and further submit that substantive consolidation will best utilize the Debtors' assets under the Plan.

## F.     Corporate Governance of Reorganized Ennstone

### 1.     The Board of Directors

The New Ennstone Board of Directors will consist of five directors, including (i) Mark A. Elliott, the President and Chief Executive Officer of Reorganized Ennstone; (ii) Randy Helwig, the Vice-President of Finance and Secretary of Reorganized Ennstone; (iii) a director selected by the Creditors Committee; and (iv) two additional independent directors with relevant industry experience or financial management/consulting expertise.  In addition, the Lender Group may select an individual who may observe meetings of the New Ennstone Board of Directors, but will not be a board member or have voting rights.  The New Ennstone Board members, and the nature of any compensation to be paid to the directors, will be included in the Plan Supplement.

### 2.     Senior Management

Reorganized Ennstone will continue to employ Mark A. Elliott as President and Chief Executive Officer and Randy Helwig as Vice-President of Finance and Secretary.  Reorganized Ennstone will assume all of the employment agreements of the senior management, as modified to extend the agreements through December, 2012 and to provide a severance package of 2 years.  Additional information regarding the nature of compensation to be paid to the officers will be included in the Plan Supplement.

G.      **The Management Incentive Plan**

On the Effective Date, Reorganized Ennstone shall be deemed to have adopted the Management Incentive Plan without any further action by the Debtors, the Reorganized Debtors, or the New Ennstone Board of Directors.  The Management Incentive Plan will include a reserve of 20% of New Common Stock on a non-dilutive basis to be distributed on the Effective Date and will include Cash incentives and a bonus pool based upon the achievement of certain performance targets set forth in the Management Incentive Plan.  A copy of the Management Incentive Plan will be provided in the Plan Supplement.

H.      **Claims Adjudication and Distributions**

1.      _Distribution Record Date_.  As of the close of business on the Confirmation Date, the Claims Register shall be deemed closed, and there shall be no further changes in the record holders of any Claim or Equity Interests unless otherwise specifically provided under the Plan or agreed to by the Debtors.  The Debtors shall not have any obligation to recognize any transfer of any Claim or Equity Interest occurring on or after the Confirmation Date.  The Debtors will instead be authorized and entitled to recognize and deal for all purpose under the Plan with only those record holders stated on the Claims Register as of the close of business on the Confirmation Date.

2.      _Distributions by Reorganized Ennstone_.  Reorganized Ennstone shall make distributions on account of all Allowed Claims entitled to receive distributions under the Plan, including Allowed Administrative claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and Allowed Secured Claims, but shall make no distributions directly to holders of Allowed General Unsecured Claims, Allowed Deficiency Claims of the Equipment Vendors, and Allowed Convenience Claims, which shall be made by the Distribution Agent.

3.      _Distribution Agent_.  The Distribution Agent shall make distributions on account of all Allowed General Unsecured Claims entitled to receive distributions under the Plan, Allowed Deficiency Claims of the Equipment Vendors, and Allowed Convenience Claims.  The Distribution Agent will be the Litigation Trustee selected by the Creditors Committee.  The Distribution Agent will hold 40% of the New Common Stock of Reorganized Ennstone in the Litigation Trust as nominee, and at such time as the New Common Stock is sold or otherwise monetized, the Distribution Agent, after the payment of costs relating to distributions and any taxes attributable to the monetization of the New Common Stock, will distribute the net proceeds to holders of Allowed General Unsecured Claims in Class 5 and Allowed Deficiency Claims in Class 4 on a Pro Rata basis.  The Distribution Agent will also be responsible for distributing any other proceeds of the Litigation Trust to the holders of Allowed General Unsecured Claims in Class 5 on a Pro Rata basis.  Distributions to holders of Allowed General Unsecured Claims and Allowed Convenience Claims that are undeliverable or time barred and voided pursuant to the terms of the Litigation Trust shall revert to the Distribution Agent for subsequent distribution to holders of Allowed General Unsecured Claims on a Pro Rata basis.

4.      _Objections to Claims_.  The Debtors, and from and after the Effective Date, Reorganized Ennstone, are entitled to object to Claims.  Unless extended by the Court, any objections to Claims by Reorganized Ennstone shall be filed and served on or before ninety (90) days after the Effective Date.  Notwithstanding any other provision to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.      _Disputed Claims Reserve_.  In accordance with the terms of the Litigation Trust, the Distribution Agent will maintain a reserve for Disputed Claims at an amount equal to the aggregate of 100% of the distributable amounts to which holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts.  The holder of a

Disputed Claim that becomes an Allowed Claim will receive distributions from the Distribution Agent as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such distributions will be made in accordance with the terms of the Litigation Trust. No holder of a Disputed Claim will have any Claim against the Disputed Claim Reserve or the Litigation Trust with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim will have any right to interest on such Disputed Claim.

**I.      Executory Contracts**

> 1.      <u>General Treatment</u>

On the Effective Date, all executory contracts and unexpired leases to which either of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease:

> a.      has been previously assumed, assumed and assigned or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date;

> b.      is the subject of a motion to assume, assume and assign or reject pending as of the Effective Date;

> c.      is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the assumption or rejection of the executory contracts and unexpired leases, as of the Effective Date.

> 2.      <u>Contracts and Leases Entered Into After the Petition Date</u>

Contracts and leases entered into after the Petition Date will be performed by Reorganized Ennstone in the ordinary course of business, and will survive and remain unaffected by entry of the Confirmation Order.

> 3.      <u>Cure of Defaults</u>

Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be an Allowed Administrative Claim and satisfied in Cash on the Effective Date or on such other terms as the parties may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, the Debtors shall provide notices of proposed assumption and proposed cure amounts to be sent to applicable contract parties, and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to the assumption and cure amount. If an objection to the Debtors' proposed cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole discretion, may elect to reject such executory contract in lieu of assuming it.

4.      Rejection Claims

In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors, or Reorganized Ennstone, unless a proof of claim has been filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as an Allowed General Unsecured Claim under Class 5 of the Plan.

## J.      Release and Exculpation

*On the Effective Date, the Released Parties shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another, to any other party in interest, or to any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or to any of their successors or assigns, for any act or omission before or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the operation of the Debtors' business (other than liabilities incurred in the ordinary course of the Debtors' business), this chapter 11 case, the filing of this case, the formulation, preparation, dissemination, approval, confirmation, administration, implementation or consummation of the Plan, the Disclosure Statement, or the property to be distributed under the Plan.*

*None of the Released Parties will have or incur any liability to any holder of a Claim or Equity Interest for any act or omission occurring after the Petition Date in connection with, related to, or arising out of the Cases, including, without limitation, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

## K.      Effect of Confirmation

1.      Vesting of Assets

On the Effective Date, pursuant to §§1141(b) and (c) of the Bankruptcy Code, all property of the Estate shall vest in Reorganized Ennstone including all claims, rights and causes of action and any property acquired by the Debtors or Reorganized Ennstone under or in connection with the Plan, free and clear of all Claims, liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan.

2.      Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the merger of King William Sand & Gravel Mattaponi and Ennstone, Inc.; (ii) the distribution of the New Common Stock; (iii) the filing of appropriate certificates or articles of incorporation; (iv) the selection of the directors and Lender Group observer to the New Ennstone Board of Directors; (v) the execution and entry into the New Term Loan and all documents, instruments, agreements and financing statements in connection therewith; (vi) the implementation of the Management Incentive Plan; (vii) the adoption or assumption of the Management Employment Agreements; and (viii) all other corporate actions contemplated by the Plan.

On and after the Effective Date, Reorganized Ennstone may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules

30

subject to the terms and provisions of the Plan and the amended or new corporate governance documents to be entered into as of the Effective Date.

3.  Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in any one or more of the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

4.  Discharge

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in the Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of any and all Claims, whether known or unknown, against the Debtors or any of their assets or properties, regardless of whether the property shall have been distributed or retained pursuant to the Plan.  Without limiting the generality of the foregoing, the Debtors shall be discharged from any and all debts of the kind specified in sections 502(g), 502(h) of 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim accepted the Plan.

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and Claims, and terminate all Equity Interests of any kind, nature or description, whatsoever, against or in the Estates or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise provided herein or in the Confirmation Order, upon the Effective Date, all existing Claims against the Estates shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Estates, or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or is listed in the Schedules.

5.  Injunction

On and after the Confirmation Date, all Persons are permanently enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.  All Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estate are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estate or Reorganized Ennstone or any of their property; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, of any judgment, award, decree or order against the Debtors, the Estate or Reorganized Ennstone or any of their property; (iii) creating, perfecting or otherwise enforcing in any manner, any encumbrance of any kind against the Debtors, the Estate or Reorganized Ennstone or any of their property; (iv) exercising any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, the

31

Estate or Reorganized Ennstone; and (v) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## L.    Retention of Jurisdiction of the Bankruptcy Court

The Bankruptcy Court will retain jurisdiction of all matters arising under, arising out of, or related to the Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:  (a) to hear and determine motions for the sale of property and for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom; (b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding to prosecute a Cause of Action (subject to 28 U.S.C. §§ 157 and 1334); (c) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim; (e) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated; (f) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court; (g) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof; (h) to hear and determine all applications under sections 328, 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals and members of the Committee prior to and following the Confirmation Date; (i) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing; (j) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Trust Agreement, and to hear and determine all matters involving or relating to the Litigation Trust or the Litigation Trustee; (k) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation; (l) to recover all assets of the Debtors' property of the Estates, wherever located, which jurisdiction shall not be limited as a result of the transfer of any Causes of Action to the Litigation Trust pursuant to the Plan; (m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order; (n) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan); (o) to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and (p) to enter a final decree closing the Cases.

## M.   Conditions Precedent

The following are conditions precedent to the Effective Date of the Plan:

1.      The Plan shall have been substantially consummated and no stay of the Confirmation Order shall then be in effect; and

2.      All documents necessary to implement the Plan have been executed and are in full force and effect.

The Debtors shall have the right to waive these conditions at any time without leave of the Bankruptcy Court, or notice, and without any formal action other than proceeding with consummation of the Plan.

## N.   Modification of the Plan

The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims under the Plan, Reorganized Ennstone may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

## O.   Revocation and Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Debtors make such a determination, the Plan shall be deemed null and void. In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

## P.   Section 1145 Exemption

The issuance of the Preferred Stock and New Common Stock to holders of Claims on account of their Claims, including the New Common Stock issued to the Litigation Trust, shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date, and are exempt from registration under the Securities Act of 1933 and any state or local law requiring registration.

## V.    UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

## A.   Introduction

The following discussion summarizes certain material United States federal income tax ("Federal Income Tax") consequences of the Plan to certain holders of Allowed Claims (the "Creditors") and the Debtors. This discussion does not address the Federal Income Tax consequences to: (i) Creditors whose claims are entitled to payment in full in cash, or are otherwise unimpaired under the Plan; and (ii) holders of equity interests or claims that are extinguished without a distribution. This discussion is based upon

existing provisions of the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect.  No assurance can be given that future legislation, regulations, administrative pronouncements and/or judicial decisions will not change applicable law and affect the analysis described herein.  Any such change could be applied retroactively in a manner that would adversely affect the creditors and the Debtors.

The Federal Income Tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.  Counsel for the Debtors has not sought and will not seek any rulings from the Internal Revenue Service ("IRS") with respect to the Federal Income Tax consequences discussed below.  Although the discussion below represents the best judgment as to the matters discussed herein, it does not in any way bind the IRS or the courts or in any way constitute an assurance that the Federal Income Tax consequences discussed herein will be accepted by the IRS or the courts.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors or creditors and the discussion does not address the tax consequences of the Plan to certain types of creditors (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.  THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR OR THE HOLDERS OF ANY CLAIMS OR EQUITY INTERESTS, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES.   ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN IN GENERAL AND IN PARTICULAR, THE TIMING, CHARACTER AND AMOUNTS OF INCOME, GAIN, LOSS, DEDUCTION, CREDIT OR CREDIT RECAPTURE TO BE RECOGNIZED, AND ANY PROCEDURAL REQUIREMENTS WITH WHICH THE HOLDER MUST COMPLY.

## B.    Certain Material United States Federal Income Tax Consequences to the Debtors

1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the of sum of (x) the amount of cash paid and (y) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the IRC.  In general, tax attributes will be reduced in the following order: (a) NOLs;

(b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the IRC.

As a result of the Plan, the Debtors' aggregate existing indebtedness will be substantially reduced and the Reorganized Company will therefore have COD Income, which will be excluded from gross income under the rules discussed above. Because the Plan provides that Holders of certain Allowed Claims will receive New Common Stock or Preferred Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock or Preferred Stock exchanged therefore. This value cannot be known with certainty until after the Effective Date. However, the Debtors expect that, subject to the limitations discussed herein, the Reorganized Company will absorb all NOL carryovers and any other tax attributes remaining. In addition, the Company will most likely need to significantly reduce the tax basis of its remaining assets.

A recently enacted amendment to the COD Income rules provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy code, that recognize COD Income in 2009 or 2010 may elect to forgo the COD Income exclusion and attribute the reduction rules described above. Instead, the taxpayer may elect to take into taxable income the COD Income with respect to such debt in equal installments in 2014 through 2018 (i.e. the taxpayer would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD Income, and, in the case of debt of a partnership, is made at the partnership level. The Debtors do not intend to elect to apply this new rule.

2. <u>Limitation of New Operating Loss Carryforwards and Other Tax Attributes</u>

The precise amount of the NOL carryforwards and other tax attributes that will be available, if any, to the Reorganized Company at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount and utilization of the NOLs include the following: (a) the amount of tax losses incurred by the Debtors through emergence; (b) the value of the New Common Stock or Preferred Stock; and (c) the amount of COD Income incurred by the Debtors in connection with the Effective Date.

Following the Effective Date, the Debtors anticipate that any remaining NOL and tax credit carryovers and, possibly, certain other tax attributes of the Reorganized Company allocable to periods prior to and including the Effective Date (collectively, "<u>Pre-Change Losses</u>") will be subject to a limitation under section 382 of the IRC as a result of an "ownership change" by reason of the transactions pursuant to the Plan. Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the issuance of the New Common Stock or Preferred Stock pursuant to the Plan will result in an "ownership change" for these purposes and that the Reorganized Company's use of any NOL carryovers will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

3. <u>Alternative Minimum Tax</u>

In general, an alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income ("<u>AMTI</u>") each year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for such year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other

beneficial allowances are modified or eliminated.  For example, even though for regular tax purposes a corporation might otherwise be able to offset all of its taxable income by NOL carryovers from prior years, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. This rule could cause certain Reorganized Debtors to owe federal and state income tax on taxable income in future years even though NOL carryforwards are available to offset regular taxable income.

Additionally, if a corporation undergoes an "ownership change" within the meaning of section 382 of the IRC, the section 382 rules discussed above also apply to its NOL carryforwards for AMT purposes.  Any AMT tax that a corporation pays is generally allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future years to the extent that the corporation is no longer subject to AMT.

## C.    Certain Material United States Federal Income Tax Consequences to Holders of Claims

### 1.    General

The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) whether the Claim (or any portion thereof) constitutes a Claim for principal or interest; (ii) the type and classification of consideration received by the holder in exchange for the Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above); (iv) the manner in which a holder acquired a Claim; (v) the length of time the Claim has been held; (vi) whether the claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder.  Therefore, holders of Claims should consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to them of the transactions contemplated by the Joint Plan.

A holder of a Claim should generally recognize a gain (or loss) to the extent that the amount realized under the Plan in respect of the Claim exceeds (or is exceeded by) the holder's tax basis in the Claim.  The holder's amount realized for this purpose will generally equal the amount of Cash the holder receives under the Plan in respect of its Claim.  The timing and amount of income, gain or loss recognized as a consequence provided for by the Plan will depend on, among other things, whether the holder of a Claim receives multiple distributions pursuant to the Plan and whether the Debtors' obligation to make such payments is treated as a new debt for United States federal income tax purposes.  Gain or loss may not currently be recognized if the property received does not have an ascertainable fair market value.

### 2.    Accrued But Untaxed Interest

A portion of the consideration (whether cash, stock, debt or other consideration) received by Holders of Claims and Interest may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, a holder generally recognizes a deductible loss to the extent any accrues interest claimed was previously included in income and is not paid in full.

If the fair value of the consideration received by Holders of Claims and interests is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will

be attributable to accrued by untaxed interest is unclear.  Holders of Claims and Interest should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

3.      Market Discount

The market discount provisions of the Internal Revenue Code of 1986 (the "Tax Code") may apply to holders of certain Claims.  In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds the tax basis of the debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount.  Gain recognized by the holder of a Claim with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's grace period of ownership, unless the holder elected to include accrued market discount in taxable income currently.  A holder of a market discount bond that is required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond.

4.      Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor (the Debtors) to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the Tax Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Holders of Claims that are non-United States Persons and that receive payments or distributions under the Plan will not be subject to backup withholding, provided that such holders furnish certification of their status as non-United States Persons (and furnish any other required certification), or are otherwise exempt from backup withholding.  Generally, such certification is provided on IRS Form W-8BEN.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS.  THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER.

## VI.      ALTERNATIVES TO THE PLAN

The Debtors submit that the Plan is the best means of providing maximum recoveries to holders of Allowed Claims.  Alternatives to the Plan include (i) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code, and (ii) alternative chapter 11 plans.  Consideration of these alternatives to the Plan have caused the Debtors to conclude that the Plan, in comparison, provides a greater recovery to

creditors in a manner which minimizes inherent risks in any other course of action available to the Debtors.

### A.  Other Plans of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a chapter 11 plan has expired) could attempt to formulate an alternative chapter 11 plan that might provide for the disposition of the Debtors' assets other than as provided in the Plan. However, the Debtors submit that any alternative chapter 11 plan will not provide a greater return to impaired creditors than the Plan.  Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and is highly unlikely to formulate a methodology to create greater value (return) to impaired creditors than the Plan.  Accordingly, the Debtors submit that the Plan will enable all creditors entitled to distributions to realize the greatest possible recovery on their respective Claims with the least possible delay.

### B.  Liquidation under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee would be appointed (or subsequently elected) to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.  If a trustee is appointed and the assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, creditors would likely receive distributions of a lesser value on account of their Allowed Claims.  A chapter 7 trustee would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estates and Causes of Action, thereby substantially increasing both costs and time necessary to fully administer the Estates.  Likewise, in addition to fees of professionals retained by a chapter 7 trustee, the chapter 7 trustee would also charge a fee tied to the value of all assets administered by the chapter 7 trustee in accordance with section 326(a) of the Bankruptcy Code.

### C.  Dismissal of the Chapter 11 Cases

If the Cases were dismissed, the Lender Group and the Equipment Vendors might foreclose upon their Liens on the Debtors' property, the result being that secured creditors would receive liquidation value rather than fair market value, and unsecured creditors would not obtain any recovery.  Therefore, the Debtors submit that dismissal of these Cases is not an attractive or superior alternative to the Plan, and the Plan represents the best alternative for maximizing the return to all Creditors.

## VII.    CONFIRMATION REQUIREMENTS

### A.  Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims in each impaired class.  Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization.  If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 1 and 2 are not impaired under the Plan and are, therefore, not entitled to vote on the Plan.  Classes 3, 4, 5, 6, and 7 are impaired under the Plan and holders of Allowed Claims in such classes are entitled to vote for or against the Plan by completing and returning the Ballots mailed to them with this Disclosure Statement in the manner set

forth in the Ballots.  Class 8 is impaired under the Plan, but is deemed to reject the Plan, and is not entitled to vote on the Plan.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely Ballots have been received have voted for acceptance of the Plan.

Because the equity interests held by the members of Class 8 are eliminated entirely under the Plan, Class 8 is deemed to have rejected the Plan, and the Debtors cannot satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Accordingly, the Debtors intend to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b), the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each class of impaired Allowed Claims and Equity Interests that have not voted to accept the Plan.

## B.    Best Interests of Creditors

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the Cases and subsequently allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and non-priority Claims in the Chapter 11 cases.

As described in more detail in the Liquidation Analysis attached hereto as Exhibit C, the Debtors submit that each Impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors also submit that the value of any distributions to each Secured Creditor in a Chapter 7 liquidation would be less than the value of distributions under the Plan and such distributions in a chapter 7 case would not occur for a substantial period of time.

## C.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  The Debtors submit that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

The Debtors have prepared financial projections for calendar years 2010 through 2012, which are attached hereto as <u>Exhibit D</u>.  These financial projections incorporate Chapter 11 Plan obligations, and assume that the Effective Date will be December 31, 2009.  Based upon these projections, the Debtors believe that they will be able to make all payments required under the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## D.        Confirmation of the Plan

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

## VIII.   <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.        Parties-In-Interest May Object to the Debtors' Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors submit that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Debtors cannot give assurances that the Bankruptcy Court will reach the same conclusion.

## B.        The Debtors' May Not Be Able to Secure Confirmation of the Plan

The Debtors cannot assure you that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, the Debtors cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (a) a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization; (b) that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan does not unfairly discriminate and is fair and equitable with respect to any non-accepting Classes.  While the Debtors cannot give assurances that the Bankruptcy Court will conclude that these requirements have

been met, the Debtors submit that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.

## C.      The Debtors May Object to the Amount or Classification of Your Claim

The Debtors reserve the right to object to the amount or classification of any claim. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose claim is subject to an objection. Any such creditor may not receive its expected share of the estimated distributions described in this Disclosure Statement.

## D.      Business Operations and Financial Projections

The Financial Projections attached as <u>Exhibit D</u> to this Disclosure Statement are dependent upon the success of future business operations. The projections reflect numerous assumptions, including the sale of Non-Core Assets described in section IV.B; confirmation and consummation of the Plan in accordance with its terms; the anticipated future performance of Reorganized Ennstone; and general business and economic conditions, which are beyond the control of Reorganized Ennstone. Unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect actual financial results. Although the Debtors submit that the projections are reasonably attainable, variations between the actual financial results and the projections may occur.

## IX.      WHERE YOU CAN OBTAIN MORE INFORMATION

Pursuant to the requirements of the Office of the United States Trustee, the Debtors are required to and have filed monthly operating reports for the postpetition period with the Bankruptcy Court. These monthly operating reports may be obtained at prescribed per page copy rates by writing to the Clerk of the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) 701 East Broad Street, Richmond, VA 23219, or on-line at the Bankruptcy Court's website: http://www.vaeb.uscourts.gov/home/rihome.html.

## X.      CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Allowed Claims. The Debtors urge holders of Allowed Claims entitled to vote on the Plan to vote to accept the Plan.

Dated: November 24, 2009

Ennstone, Inc., and King William Sand & Gravel Mattaponi, Inc.

By:     /s/ *Mark A. Elliott*
Name: Mark A. Elliott
Title:   President

\10203380